**Russell CARLSON, Individually and on Behalf of all others Similarly Situated, Plaintiffs,**

v.

**XEROX CORPORATION, KPMG LLP, Paul A. Allaire, G. Richard Thoman, Anne Mulcahy, Barry Romeril, Gregory Tayler, and Philip Fishbach, Defendants.**

Civil No. 3:00CV01621(AWT).

United States District Court,
D. Connecticut.

Jan. 14, 2009.

Charles Reiner, pro se.

Peter Carfagna, pro se.

Dennis J. Johnson, Gregory H. Mathews, Jacob B. Perkinson, Johnson & Perkinson, South Burlington, VT, Eliot B. Gersten, John Joseph Robaczynski, Gersten & Clifford, Nancy A. Kulesa, Jeffrey S. Nobel, Izard Nobel, LLP, Andrew S. Groher, Riscassi & Davis, P.C., Derek M. Johnson, Maura Hughes Horan, Ruben, Johnson & Morgan, Hartford, CT, Francis P. Karam, Keith M. Fleischman, Jeffrey M. Haber, Mel E. Lifshitz, Steven B. Singer, Timothy J. MacFall, Bernstein Liebhard & Lifshitz LLP, Aaron Brody, Jules Brody, Mark Levine Stull, Stull, & Brody, Brad N. Friedman, Ted Swiecichowski, Milberg LLP, Charles T. Caliendo, Gant & Eisenhofer, Domenico G. Minerva, Grant & Eisenhofer, P.A. New York, NY, Richard J. Fox, Shelburne, VT, Abigail Romeo, Bryan A. Wood, Leslie R. Stern, Berman Devalerio, Glen Devalerio, Jeffrey C. Block, Michael G. Lange, Berman, Devalerio, Pease, Tobacco, Burt & Puccillo Boston, MA, Charles J. Piven, Law Offices of Charles J. Piven, P.A., Baltimore, MD, Christopher C. Allen, Dennis J. Johnson, Gregory H. Mathews, Jacob B. Perkinson, James F. Conway, III, Johnson & Perkinson, South Burlington, VT, Elias A. Alexiades, New Haven, CT, David A. Slossberg, J. Daniel Sagarin, Hurwitz Sagarin Slossberg & Knuff LLC, Milford, CT, Adam J. Teller, Leone, Throwe, Teller & Nagle, East Hartford, CT, Roy B. Thompson, Lake Oswego, OR, Ananda Chaudhuri, Dmitry Pilipis, Geoffrey C. Jarvis, Jay W. Eisenhofer, Jill Agro, Sharan Nirmul, Stuart M. Grant, Grant & Eisenhofer, Wilmington, DE, John K. Aurell, John R. Beranek, Martin Bruce Sipple, Ausley & McMullen, Tallahassee, FL, Daniel A. Silver, Law Office of Daniel A. Silver, New Britain, CT, John J. Pentz, Maynard, MA, for Plaintiffs.

Evan R. Chesler, Hector J. Valdes, Kevin J. Orsini, Rachel G. Skaistis, Sandra C. Goldstein, Timothy F. Van Voris, Cravath, Swaine & Moore, Jay B. Kasner, Skadden, Arps, Slate, Meagher & Flom, George A. Salter, M. Gavan Montague, Mark J. Lemire, W. Sidney Davis, Jr., Hogan & Hartson, Kenneth M. Kramer, Shearman & Sterling, New York, NY, Ivy Thomas McKinney, Norwalk, CT, Bryan Scott Gowdy, David M. Wells, McGuire, Woods, Battle & Boothe, LLP, Jacksonville, FL, Joseph W. Hatchett, Akerman, Senterfitt & Eidson, Tallahassee, FL, Steven David Ecker, Thomas J. Murphy, Cowdery, Ecker & Murphy, L.L.C., Hartford, CT, Alfred U. Pavlis, Daly & Pavlis, LLC, Southport, CT, Elizabeth K. Canizares, Felipe D. Mendoza, Gordon Pearson, John A. Valentine, Wilmer Cutler Pickering Hale & Dorr-LLP, Washington, DC, Rosemary Q. Barry, Terence J. Gallagher, III, Day Pitney LLP, Stamford, CT, for Defendants.

### RULING ON MOTION FOR AWARD OF ATTORNEYS' FEES

ALVIN W. THOMPSON, District Judge.

Louisiana State Employees' Retirement System ("LASERS"), Dr. Paul Dantzig, and Thomas Zambito (collectively, the "Lead Plaintiffs"), on behalf of themselves and the Class have moved for an order granting: final approval of the proposed

settlement ("Settlement") of the above-captioned action ("Action") against Xerox Corporation ("Xerox"), KPMG LLP ("KPMG"), and six of Xerox's former or current officers and/or directors (collectively, the "Defendants") for a payment of $750 million in cash, plus interest (the "Settlement Fund"); final approval of the proposed plan of allocation (the "Plan of Allocation") for the Settlement Fund; a reimbursement award to Lead Plaintiffs for the time, services, and expenses they incurred in prosecuting the Action; and an award of attorneys' fees and reimbursement of expenses incurred in connection with the prosecution and settlement of the Action.

The Lead Plaintiffs seek an award of attorneys' fees equal to 20% of the Settlement Fund, plus reimbursement of expenses. A fairness hearing was held on October 7, 2008, and the only objections to the Settlement were with respect to the requested award of attorneys' fees. The court has issued a separate order granting final approval of the Settlement, final approval of the Plan of Allocation, and making a reimbursement award to the Lead Plaintiffs. After considering the papers submitted by the Lead Plaintiffs and by objectors, and the arguments made at the fairness hearing, the court has concluded that an award of attorneys' fees equal to 16% of the Settlement Fund, plus $3,314,399.90 for reimbursement of expenses, is most appropriate.

## I. *LEGAL STANDARD*

In *Goldberger v. Integrated Resources, Inc.*, the Second Circuit held that "either the lodestar or percentage of the recovery methods may properly be used to calculate fees in common fund cases...." 209 F.3d 43, 45 (2d Cir.2000). These "two distinct methods" were described by the court as follows:

The first is the lodestar, under which the district court scrutinizes the fee petition to ascertain the number of hours reasonably billed to the class and then multiplies that figure by an appropriate hourly rate. *See Savoie v. Merchants Bank*, 166 F.3d 456, 460 (2d Cir.1999). Once that initial computation has been made, the district court may, in its discretion, increase the lodestar by applying a multiplier based on "other less objective factors," such as the risk of the litigation and the performance of the attorneys. *Id.* (internal quotation marks omitted).

The second method is simpler. The court sets some percentage of the recovery as a fee. *See id.* In determining what percentage to award, courts have looked to the same "less objective" factors that are used to determine the multiplier for the lodestar. *See Brown v. Phillips Petroleum Co.*, 838 F.2d 451, 454–55 (10th Cir.1988).

*Id.* at 47. With respect to the use of the percentage of recovery method, however, the court noted that "the lodestar remains useful as a baseline even if the percentage method is eventually chosen. Indeed, we encourage the practice of requiring documentation of hours as a 'cross check' on the reasonableness of the requested percentage. Of course, where used as a mere cross-check, the hours documented by counsel need not be exhaustively scrutinized by the district court." *Id.* at 50 (internal citations omitted). The court also observed that:

[N]o matter which method is chosen, district courts should continue to be guided by the traditional criteria in determining a reasonable common fund fee, including: "(1) the time and labor expended by counsel; (2) the magnitude and complexities of the litigation; (3) the risk of the litigation ...; (4) the quality

of representation; (5) the requested fee in relation to the settlement; and (6) public policy considerations." [*In re*] *Union Carbide* [*Corp. Consumer Products Business Sec. Litig.*], 724 F.Supp. [160] at 163 [ (S.D.N.Y.1989) ] (summarizing *Grinnell* opinions).

*Id.*

*Goldberger* contains an informative discussion of the evolution in the Second Circuit of the standard for awarding attorneys' fees in common fund cases. Several points are made about the percentage of recovery method. First, the court noted that "the routine award of fees in the 20% to 30% range had led to a perception that the percentage approach increasingly tended to yield too little for the client-class" and too much for the attorneys. *Id.* at 48. (internal citation omitted). *City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir.1974) ("*Grinnell I* ") was a response to this perception. In that case, the court "revers[ed] and remand[ed] a 15% fee award with instructions to base future awards on counsel's lodestar." *Id.* In *City of Detroit v. Grinnell Corp.*, 560 F.2d 1093 (2d Cir.1977)("*Grinnell II* "), the court "again revers[ed] the fee award which, though based on lodestar, amounted to about 10% of recovery and was still excessive." *Id.*

Second, although "the assumption that twenty-five percent is the benchmark that district courts should award in common fund cases" the court was "nonetheless disturbed by the essential notion of a benchmark." *Id.* at 51–52. The court took note of the problem of not knowing "precisely what fees common fund plaintiffs in an efficient market for legal services would agree to, given an understanding of the particular case and the ability to engage in collective arm's-length negotiation with counsel." *Id.*

Third, also in the context of why the court was disturbed by the notion of a benchmark, but with its focus on cases where the common fund was between $50 million and $75 million, the court made an observation that suggested it would be reasonable to expect to see a general trend of lower percentages of the fund being awarded for attorneys' fees as the size of the fund increased:

> Starting an analysis with a benchmark could easily lead to routine windfalls where the recovered fund runs into the multi-millions. "Obviously, it is not ten times as difficult to prepare, and try or settle a 10 million dollar case as it is to try a 1 million dollar case." *Union Carbide*, 724 F.Supp. at 166. Indeed, empirical analyses demonstrate that in cases like this one, with recoveries of between $50 and $75 million, courts have traditionally accounted for these economies of scale by awarding fees in the lower range of about 11% to 19%. *See* Lynk, 23 J. Legal Stud. at 202; *see also* 1 Conte, Attorney Fee Awards § 2.09 (putting range at 13% to 20%).

*Id.* at 52.

Fourth, in the same context, the court commented on "the principal analytical flaw in . . . [the] assumption that there is a substantial contingency risk in every common fund case." The court stated:

> We harbor some doubt that this assumption is justified in cases such as this. At least one empirical study has concluded that "there appears to be no appreciable risk of non-recovery" in securities class actions, because "virtually all cases are settled" . . . Of course, we are not suggesting that compensation for risk is never permitted, merely that it is not— under either the percentage or lodestar methods—an appropriate starting assumption. Even where there is some contingency risk but recovery remains

virtually certain, we question whether a fully informed group of plaintiffs able to negotiate collectively would routinely agree to pay their lawyers a fee of 25% of a multi-million dollar settlement.

*Id.* (internal italics omitted). The court then made the point that "plaintiffs in common fund cases typically are not fully informed. Nor are they able to negotiate collectively, or at arm's length." *Id.* at 49.

The court also made several observations about the lodestar method. First, the court observed that district courts have found that the lodestar method "created a temptation for lawyers to run up the number of hours for which they could be paid." *Id.* at 48. Second, "the lodestar created an unanticipated disincentive to early settlements." Third, the court noted that the "primary source of dissatisfaction" was that the lodestar method "compell[ed] district courts to engage in a gimlet-eyed review of line-item fee audits," which led to "an inevitable waste of judicial resources." *Id.*

## II. *DISCUSSION*

### A. Fee Awards in Other Large PSLRA Settlements

In support of their fee application, the Lead Plaintiffs' have submitted a report prepared by a retired federal judge. *See* Private Memorandum Opinion (the "Wolin Report")(Doc. No. 493, Ex. 1.) The Wolin Report includes a chart of the Top 26 post-PSLRA settlements, not including this case (the "Top 26 Chart"). The settlement in this case will be the tenth largest post-PSLRA settlement when included on this chart. The Wolin Report concludes that the fee request by Plaintiffs' Counsel is consistent with fee awards in similar cases:

> The fee request at issue is on par with fee awards in similar cases in the Second Circuit. *See, e.g., In re Adelphia Communs. Corp. Sec. and Derivative Litig.*, No. 03 MDL 1529(LMM), 2006 WL 3378705, at *1, *3 (S.D.N.Y. Nov. 16, 2006)(awarding 21.4% of $455 million fund); *In re Freddie Mac Sec. Litig.*, No. 03–CV–4261 (JES), *slip op.* at 1 (S.D.N.Y. Oct. 27, 2006)(awarding 20% of $410 million fund); *In re Oxford Health Plans, Inc. Sec. Litig.*, No. MDL–1222 (CLB) *slip op.* at 7 (S.D.N.Y. June 12, 2003)(awarding 28% of $300 million fund); *In re Priceline.com, Inc. Sec. Litig.*, Civ. No. 00–1884(AVC), 2007 WL 2115592, at *5 (D.Conn. July 20, 2007)(awarding 30% of $80 million fund).

> Lead Counsel's fee request is also consistent with fee awards in other jurisdictions. *See, e.g., In re Rite Aid Corp. Sec. Litig.*, 146 F.Supp.2d 706, 736, n. 44 (E.D.Pa.2001)(awarding 25% of $193 million fund); *In re Rite Aid Corp. Sec. Litig.*, 362 F.Supp.2d 587, 588–90 (E.D.Pa.2005)(awarding 25% of $125 million fund); *In re DaimlerChrysler AG Sec. Litig.*, No. Civ.A. 00–993, *slip op.* at 43–50 (D.Del. Feb. 5, 2004)(awarding 22.5% of $300 million fund); *In re Williams Sec. Litig.*, No. 02–cv–072 (SPF)(FHM), *slip op.* at 2 (N.D.Okla. Feb. 12, 2003)(awarding 25% of $311 million fund).

Wolin Report at 17. This summary from the Wolin Report only lists cases where the fees awarded were 20% or more of the amount of the common fund. However, a review of the Top 26 Chart reveals that in only 6 of the 26 cases were the fees awarded 20% or more of the amount of the common fund. The largest common fund out of which fees equal to 20% or more of the amount of the fund were awarded was the $480 million fund in the *Adelphia* case. The size of the common fund in the other 5 of those cases ranged from $300 million to $410 million.

| RANK | NAME | Settlement Amount | Fee Award |
|------|------|-------------------|-----------|
| 1 | Enron | $7,227,390,000.00 | 9.52% |
| 2 | WorldCom | $6,133,000,000.00 | 5.48% |
| 3 | Tyco | $3,200,000,000.00 | 14.50% |
| 4 | Cendant (2000) | $3,166,000,500.00 | 1.73% |
| 5 | AOL/Time Warner | $2,500,000,000.00 | 5.90% |
| 6 | Nortel I | $1,142,775,308.00 | 3.00% |
| 7 | Royal Ahold | $1,100,000,000.00 | 11.88% |
| 8 | Nortel II | $1,074,265,298.00 | 7.74% |
| 9 | McKesson | $1,042,500,000.00 | 7.64% |
| 10 | Cardinal Health | $ 600,000,000.00 | 18.00% |
| 11 | Lucent | $ 517,000,000.00 | 17.00% |
| 12 | BankAmerica | $ 490,000,000.00 | 18.00% |
| 13 | Dynegy, Inc. | $ 474,050,000.00 | 8.73% |
| 14 | Adelphia Comm. | $ 460,000,000.00 | 21.40% |
| 15 | Raytheon | $ 460,000,000.00 | 9.00% |
| 16 | Waste Management II | $ 457,000,000.00 | 7.93% |
| 17 | Global Crossing | $ 447,800,000.00 | 16.04% |
| 18 | HealthSouth | $ 445,000,000.00 | 15.25% |
| 19 | Freddie Mac | $ 410,000,000.00 | 20.00% |
| 20 | Qwest | $ 400,000,000.00 | 15.00% |
| 21 | Cendant (2006) | $ 374,000,000.00 | 7.71% |
| 22 | Rite Aid | $ 319,580,000.00 | 25.00% |
| 23 | Williams Co. | $ 311,000,000.00 | 25.00% |
| 24 | Oxford | $ 300,000,000.00 | 28.00% |
| 24 | DaimlerChrysler | $ 300,000,000.00 | 22.28% |
| 24 | Bristol–Myers Squibb | $ 300,000,000.00 | 3.96% |
| — | Xerox | $ 750,000,000.00 | — |

Based on an assumption that there would be a general trend (but not a pattern from which there would be no deviation) of the percentage of the fund awarded as attorneys' fees being smaller as the size of the fund increases, the court has placed the cases on the Top 26 Chart into three groups: (i) settlements below $500 million, (ii) settlements in the range of $500 million to $1.2 billion, and (iii) settlements of $2.5 billion or greater.

Of the fifteen cases in the first group, the fee award percentage was 20% or greater in six cases, 15% or greater but less than 20% in four others, and less than 10% in five of the cases.

Of the five cases in the third group, the fee award percentage was less than 10% in

four of the cases. In *In re Tyco Intern., Ltd. Multidistrict Litig.*, 535 F.Supp.2d 249 (D.N.H.2007)("*Tyco*"), it was 14.50%. In *Tyco*, co-lead counsel argued that the court "should compare their fee request with the fees that were awarded in connection with the sixteen post-PSLRA securities fraud cases with settlements at or above $400 million." *Id.* at 266. Two objectors argued that the court "should limit [its] comparative analysis to a subset of cases in which the settlements exceeded $1 billion." *Id.* The court observed:

These "super mega-fund" cases are: [*In re*] *WorldCom* [*Inc. Sec. Litig.*, 388 F.Supp.2d 319 (S.D.N.Y.2005)], [*In re*] *Cendant* [*Corp. Litig.*, 264 F.3d 201 (3d

Cir.2001) ], *AOL Time Warner, Nortel I,* [*In re* ] *Royal Ahold* [*N.V. Sec. & ERISA Litig.,* 461 F.Supp.2d 383 (D.Md. 2006) ], and *Nortel II.* The objectors contend that the comparison set should be limited to such cases because super mega-fund cases are a distinct subclass in which the size of the recovery is explained more by the size of the class than the work expended by counsel. As a result, the objectors argue, super mega—fund cases—Tyco included—require comparatively lower POF awards to fairly compensate counsel than will be required in cases with smaller settlements.

*Id.* While 14.50% was greater than the fee award percentage in any of the super mega-fund cases, 14.50% was "in line with the POF awards for the other cases in the class (seventh out of seventeen)." *Id.* at 266–67. In determining whether to limit its comparative analysis to super mega-fund cases, the court in *Tyco* found it helpful to look at the lodestar expressed as a percentage of the settlement amount:

> The objectors' contention that super mega-fund cases warrant lower POF awards than smaller cases because they require proportionally less work may well be true as a general matter. *See generally In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions,* 148 F.3d 283, 339 (3d Cir.1998)("the basis for this inverse relationship [between the settlement amount and the appropriate POF] is the belief that in many instances the increase [in recovery] is merely a factor of the size of the class and has no direct relationship to the efforts of counsel" (internal quotations omitted)). However, the generalization on which the objectors' argument depends does not hold in this case. The best measure of the effort required to produce a particular result in a given case is the lodestar. In this case, the

lodestar expressed as a percentage of the settlement amount is 5.38%. As Appendix 1 demonstrates, this "lodestar percentage" is substantially higher than the lodestar percentages for all but one of the super mega-fund cases and it is much more closely aligned with the lodestar percentages in the larger set of cases that Co–Lead Counsel have proposed for comparison purposes. In other words, whether or not super mega-fund cases generally require proportionally less effort than smaller cases, the generalization is not true in this case.

*Id.* at 267.

In the instant matter, however, the lodestar is $95,942,272.25 and the settlement amount is $750 million. So the lodestar expressed as a percentage of the settlement amount is 12.79%. Of the eleven cases in the first and second groups, the lodestar expressed as a percentage of the settlement amount exceeds 5.34% in only one case: in *Lucent* it is 7.98%. In the 15 cases in the third group, the lodestar expressed as a percentage of the settlement amount exceeds 8.62% in only two cases. See *Appendix A.* In *Williams Companies,* where the settlement amount was $311 million, the percentage was 17.18%, and in *Oxford,* where the settlement amount was $300 million, the percentage was 15.64%.

The Top 26 Chart reflects that in *Williams Companies,* the case was at the summary judgment stage at the time of settlement and 18,000,000 pages of documents had been reviewed and 150 depositions had been taken. It reflects that in *Oxford,* the case settled on the eve of trial and 1,000,000 pages of documents had been reviewed and 56 depositions had been taken. In the instant case, settlement was at the stage where merits discovery was ongoing.

There are six other cases in the second group. The court concludes that the second group of cases is the most appropriate set of cases to use for the purpose of comparative analysis because (i) the $2.5 billion dollar settlement in *AOL Time Warner* is twice the settlement amount in *Nortel I,* and (ii) the settlement amount in the instant case falls fairly close to the midpoint of the range of settlement amounts in the cases in the second group, and there is a larger gap between the settlement amounts in *Lucent* and *Bank of America* than between the settlement amounts in *Bank of America* and *Dynegy, Inc.*

The Top 26 Chart reflects the following about the instant case and the cases in the second group, with the multiplier for the instant case being the proposed multiplier and the column "Lodestar as Percentage" being the court's calculation based on the numbers on the Top 26 Chart (except with respect to Xerox):

| Case | Multiplier | Fee Award % | Stage of Case Upon Settlement | Pages Reviewed | Depositions | Lodestar as Percentage |
|---|---|---|---|---|---|---|
| Nortel I | 2.1 | 3.00 | Class Certification | 2,000,000 | 0 | 1.46 |
| Royal Ahold | 2.6 | 11.88 | Class Certification | 15,000,000 | 65 | 4.62 |
| Nortel II | 4.6 | 7.74 | Class Certification | 10,000,000 | 12 | 1.62 |
| McKesson | 2.1 | 7.64 | Merits Discovery | 2,000,000 | 0 | 3.68 |
| Cardinal Health | 5.9 | 18.00 | Merits Discovery | 7,200,000 | 0 | 3.06 |
| Lucent | 2.1 | 17.00 | Class Certification | 3,000,000 | 75 | 7.98 |
| Xerox | 1.56 | 20.00 | Merits Discovery | 4,000,000 | 7 | 12.40 |

The Top 26 Chart also reflects that in *Royal Ahold* and *McKesson,* there were parallel criminal proceedings against company executives.

The Wolin Report also contains a comparison of the settlement amount and the amount of the settlement with the Securities and Exchange Commission ("SEC") in cases where there were parallel SEC proceedings:

| Case | SEC Settlement | Class Settlement | Ratio of SEC/ Class Settlement |
|---|---|---|---|
| Tyco | $ 50,000,000 | $3,200,000,000 | 1.6% |
| Xerox | $ 61,878,132 | $ 750,000,000 | 8.3% |
| AOL/Time Warner | $300,000,000 | $2,650,000,000 | 11.3% |
| WorldCom | $750,000,000 | $6,133,000,000 | 12.2% |
| Bristol–Myers Squibb | $150,000,000 | $ 300,000,000 | 50.0% |
| Qwest | $250,000,000 | $ 400,000,000 | 62.5% |

*See* Wolin Report, Exhibit C. The Top 26 Chart reflects that in each of these cases except the instant case and Bristol–Myers Squibb, there were parallel criminal proceedings against company executives.[1]

1. Although the Top 26 Chart does not reference parallel criminal proceedings for the Bristol–Myers Squibb case, the Wolin Report states that there were parallel criminal proceedings. *See* Wolin Report at 31–32. In fact, after the PSLRA settlement in 2004, the company entered into a deferred prosecution agreement with the U.S. Attorney's Office in New Jersey. *See* United States Department of Justice, Deferred Prosecution Agreement, http://www.usdoj.gov/usao/nj/ press/files/

## B. Objections to Request for a 20% Fee Award

A number of persons filed objections to the request for a fee award equal to 20% of the Settlement Fund, and objectors appeared and were heard at the fairness hearing. Many of the objections related to the use of contract attorneys. There were three points raised by objectors in this area.

■ Objectors argued that the lodestar is inflated because contract attorneys performed "paralegal tasks" and were not properly supervised. The court finds these arguments unpersuasive. At the fairness hearing, Plaintiffs' Co–Lead Counsel explained the document review program developed for this case and the function performed by contract attorneys. Plaintiffs' Co–Lead Counsel also explained the training given to contract attorneys, how their work was monitored and reviewed, and how they were supervised and in some instances removed because their performance was not adequate. An email from one of the objectors to his supervising lawyer from one of the co-lead counsel firms undermines both these arguments by objectors. (*See* Lead Plaintiffs' Second Supplemental Response to Objections ("Plaintiffs' Second Supp. Resp.") (Doc. No. 517, Ex. 3).)

■ Objectors also argued that the lodestar is inflated because contract attorneys should have been billed as an expense instead of contract attorney work being billed at the rate of $300 per hour.

A contract attorney is one hired "to work on a single matter or a number of different matters, depending upon the firm's staffing needs and whether the temporary attorney has special expertise not otherwise available to the firm.... Economics is the princip[al] reason for

pdffiles/ deferredpros.pdf (last visited Jan. 14,

emergence of lawyer 'temping' because it permits a firm to service client needs during particularly busy periods by engaging an experienced attorney, without incurring the expense of hiring a permanent employee." George C. Rockas, *Lawyers For Hire and Associations of Lawyers: Arrangements that Are Changing the Way Law is Practiced,* 40 DEC B. B.J. 8 (November/December 1996).

*In re Enron Corp. Sec., Deriv. & "ERISA" Litig.,* 586 F.Supp.2d 732, 782–83 (S.D.Tex. 2008) ("*In re Enron* "). " '[T]oday it is not uncommon for an employing law firm to pay the temporary lawyer at one rate and charge that lawyer's services to the client at a higher rate that covers overhead and a contribution to firm profits.' Kathryn M. Fenton, *Use of Temporary or Contract Attorneys,* 13–FALL Antitrust 23, 24 (1998)." *Id.* at 783. Also, "under ABA Formal Opinion No. 00–420, an attorney may bill the contract attorney's charges to the client as fees rather than costs when the client's reasonable expectation is that the retaining lawyer has supervised the work of the contract lawyer or adopted that work as her own." *Id.* (internal citations omitted). *See also* ABA Comm. on Ethics and Prof'l Responsibility, Formal Op. 08–451, at 5–6 (2008).

Plaintiffs' Co–Lead Counsel explained at the fairness hearing the process followed in hiring contract attorneys and the supervision given their work. This objection was rejected by the court in *Enron,* and was also rejected by the court in *Tyco.* *See* 535 F.Supp.2d at 272. This court finds the objection unpersuasive for substantially the same reasons.

■ Objectors make a third argument, which is an extension of the second point.

2009).

In addition to arguing that contract attorney time should not be included in the lodestar, they also argue that a multiplier should not be applied to $300 an hour contract attorney time. Objectors argue that contract attorneys here were paid $55 an hour or less and their hours were included in the lodestar at $300 an hour; different rates have been cited for what contract attorneys were paid but for purposes of discussion, the court uses the rate of $55 an hour. Objectors contend that in determining what the multiplier is in this case, the court should use $55 an hour for that portion of the lodestar attributable to contract attorney work instead of $300 an hour. In effect, these objectors argue that including contract attorney time in the lodestar at the rate of $300 an hour sufficiently compensates Plaintiffs' Counsel for the risk of being paid nothing in this case, and that applying a multiplier to that portion of the lodestar results in excessive compensation, particularly in a case where the majority of the lodestar is made up of contract attorney time. The objectors point to one portion of the lodestar that is an extreme situation. One firm involved in the case has a lodestar of $4,716,187.50 and approximately 98% of that lodestar is attributable to work by contract attorneys.

Plaintiffs' Counsel's records reflect that of the total lodestar of $95,942,272.25, $60,452,031.00, i.e. 63.0%, is attributable to work by contract attorneys. Of the 290,-759.57 total hours, the portion attributable to work of the contract attorneys is 201,-506.77 hours, i.e. 69.3%. (See Plaintiffs' Second Supp. Resp. at Ex. 2.) Plaintiffs' Co–Lead Counsel point out that these percentages are in line with the percentage of the lodestar that represented contract attorney hours for lead counsel in the *Tyco* case. (See *id.* at 3–4.) Plaintiffs' Co–Lead Counsel also point out that if the charges for the contract attorney time were decreased, the multiplier in this case would still be a reasonable multiplier. They note that if 40% of the total hours of contract attorneys was eliminated, the total lodestar would be $71,761,462.20 and granting their request for a 20% fee award would equate to using a 2.09 multiplier. (See *id.* at Ex. 2.) They further note that making even a 90% reduction in contract attorney time and granting their request for a 20% fee award would equate to using a multiplier of only 3.59, which is about the 3.6 average, and not much above the 3.1 median, of the multipliers in the cases on the Top 26 Chart. But the court notes that in *Tyco* the multiplier was only 2.70, and as discussed above, the lodestar as a percentage of the fund was 5.34%, compared to 12.79% in the instant case. As to the other cases on the Top 26 Chart, the court does not have complete data showing to what extent, if any, the lodestar consists of work done by contract attorneys or what was the economic impact of using contract attorneys. In fact, the court does not have all of the relevant data necessary to perform a quantitative analysis in this case. Moreover, while those questions merit further study and analysis, undertaking such an analysis for this case, where there is sufficient information about other cases that can be used in determining a reasonable fee award percentage, would be the functional equivalent of a "gimlet-eyed review of line-item fee audits" in terms of a waste of judicial resources. *Goldberger*, 209 F.3d at 49. Thus, the court concludes that it is not objectionable *per se* in this case to apply a multiplier to a lodestar that includes work performed by contract attorneys, even though the profit margin for the firms employing them was greater than the profit margin the firms would have had for work done by full-time employees.

■ Objections were also made to the effect that the notice given to the class was

inadequate; that attorneys' fees should be paid out of the "net fund" (i.e. after payment of expenses) as opposed to the "gross fund";[2] that the amount of attorneys' fees requested was *per se* too much; and that no fees should be awarded because Milberg LLP participated in the case, and former Milberg LLP partner Melvyn Weiss (who filed an appearance in this case) and Seymour Lazar (who was never a named plaintiff in this case) were named in a federal indictment filed against Milberg LLP. The court has considered each of these objections and concluded that they lack merit for substantially the reasons set forth by Plaintiffs' Co–Lead Counsel in their memoranda. There was also an objection to the effect that the attorneys' fee award should be limited to a 15% benchmark. However, it is clear that under *Goldberger*, benchmarks should not be used. Each case must be given individualized consideration.

Objectors also argue that the 1.56 multiplier is not reasonable because there was little risk to Plaintiffs' Counsel in taking the case and that this is a mega-fund case so a lower percentage should be used. These are factors that the court addresses in its discussion below of the *Goldberger* factors.

## C. The *Goldberger* Factors

■ The first *Goldberger* factor is the time and labor expended by counsel. Here, Plaintiffs' Counsel have documented that 290,759.57 hours of attorney and litigation support time were devoted to the case. The Top 26 Chart reflects that the average number of billable hours for those cases is 102,652 and the median is 44,075. A greater number of billable hours is reported on the Top 26 Chart for only one

case: *Tyco* (488,270 hours). *Enron* (289,593 hours), which the Top 26 Chart reflects was at the trial preparation stage, and *WorldCom* (277,861 hours) come close.

The second *Goldberger* factor is the magnitude and complexity of the litigation. The court agrees with Plaintiffs' Co–Lead Counsel that the fraud alleged in this action involved multiple accounting standards that touched on numerous aspects of a multinational corporation's business, implicated operating units around the world, and spanned five annual reporting periods. The court also agrees that the rudiments of the accounting principles at issue in the case were complex, as were numerous other aspects of the case. Also, the Top 26 Chart reflects that the duration of this case was 3.58 years longer than the average duration of the cases on the chart.

The third *Goldberger* factor is the risk of the litigation. Approximately two months before any complaint was filed in this case, defendant Xerox reported that the SEC had begun an investigation of accounting issues related to its operations in Mexico, and approximately one month before any complaint was filed in this case, defendant Romeril told analysts during a conference call that several senior managers in Mexico had collaborated to circumvent Xerox accounting policies and administrative procedures. In all, 22 separate lawsuits were filed seeking to assert the claims raised in this action. The court originally appointed four firms as co-lead counsel, and after a contested motion was filed (which also resulted in LASERS being appointed as one of the Lead Plaintiffs), two of the original four co-lead counsel were replaced by one of the current lead counsel. (*See* Superseding Order Appointing Lead Plaintiffs, Lead Counsel, and Liaison Counsel

---

**2.** *See In re Enron,* 586 F.Supp.2d at 769 (stating that "under the agreement between Lead Counsel and the Regents, expenses were to be "netted" (deducted from the whole recovery) before applying fee percentages for fee award to Lead counsel").

(Doc. No. 92).) Although this case was complex and of great magnitude, there was a surplus of experienced and knowledgeable counsel who presumably assessed the risks and wanted to serve as lead counsel. Thus, it appears to the court that on balance the litigation risks here were at most those presented by a typical case, and that this case falls within the category of cases mentioned in *Goldberger* for which the presence of a substantial contingency risk is not an appropriate starting assumption. *See Goldberger,* 209 F.3d at 52.

The fourth *Goldberger* factor is the quality of representation. The court agrees with Plaintiffs' Co–Lead Counsel that the Class received high quality legal representation and obtained a very large settlement in the face of vigorous opposition by highly experienced and skilled defense counsel. With respect to this factor, the court also places weight on the fact that among the group of cases listed in the Wolin Report where there were parallel SEC proceedings, counsel in this case obtained a larger settlement in comparison to the SEC settlement than in any case except *Tyco,* and the fact that in those other cases, there were parallel criminal proceedings being pursued or apparently contemplated against company executives.

The fifth *Goldberger* factor is the requested fee in relation to the settlement. As discussed above, in only six of the cases on the Top 26 Chart were the fees awarded 20% or more of the settlement amount. A 20% fee award would be a higher percentage than in any other case in the second group, i.e. cases where the settlements were in the range of $500 million to $1.2 billion. On the other hand, Plaintiffs' Counsel are requesting that a multiplier of 1.56 be applied to the lodestar. Such a multiplier would rank as the second lowest (higher only than the 1.5 multiplier used in *Williams Companies*) on the Top 26 Chart, and the lodestar would rank as the second highest on the Top 26 Chart.

All the cases in the second group were either at the stage of class certification or "merits discovery ongoing." [3] Two of the cases had fee award percentages approaching 20%. In *Cardinal Health,* the percentage was 18%, and 7,200,000 pages of documents had been reviewed and no depositions had been taken. In *Lucent,* the fee award percentage was 17%, and 3,000,000 pages of documents had been reviewed and 75 depositions had been taken. Here, 4,000,000 pages of documents have been reviewed and 7 depositions have been taken. However, when comparing this case to *Cardinal Health* and *Lucent,* the figures of 4,000,000 pages of documents reviewed and 7 for the number of depositions taken does not adequately reflect either the effort or value of the work performed by Plaintiffs' Counsel. Pursu-

---

**3.** The court notes that in comparing the instant case to the cases in the second group, the court does not place weight on *Nortel I,* where the fee award percentage was 3%. There, the Second Circuit concluded that the district court had carefully weighed the six *Goldberger* factors before concluding that a fee award percentage of 8.5% was excessive. *See In re Nortel Networks Corp. Sec. Litig.,* 539 F.3d 129, 134 (2d Cir.2008). However, the court noted:

> Milberg also argues that the district court erred by not using the 8% Nortel II award as a "benchmark," especially because, ac-

cording to Milberg, Nortel II presented fewer litigation risks than Nortel I. We have little doubt that a 3% fee award, with a 2.04 lodestar multiplier, is toward the lower end of reasonable fee awards, and we are troubled by the district court's failure to discuss Nortel II and why it believed the fee award here to be more reasonable. But the question before us is not whether we would have awarded a different fee, but rather whether the district court abused its discretion in awarding this fee.

*Id.*

ant to the discovery program adopted by Plaintiffs' Co–Lead Counsel, the 4,000,000 pages of documents produced by the Defendants consisted of key documents on which the SEC had focused its attention. Ordinarily, a much greater number of documents would have been produced before lead counsel had obtained 4,000,000 pages of key documents. In addition, Plaintiffs' Counsel reviewed and digested all of the deposition transcripts produced by the Defendants from the SEC litigation and prior investigations. There were 68 days of deposition transcripts taken from 48 witnesses during the SEC litigation, and, in addition, 87 days of investigative deposition transcripts taken from 39 witnesses during the SEC investigations.

In *Tyco,* where a multiplier that was below the average and a number of billable hours that were the most in any case on the Top 26 Chart resulted in a requested fee award percentage that was materially higher than that in any case with a comparable total settlement amount, the court found it helpful to look at the lodestar as a percentage of the settlement amount. The court also finds such an approach to be helpful here. The fee award percentage is obtained by taking the product of the multiplier times the lodestar, and dividing that product by the settlement amount. When one focuses on the multiplier, one is focusing on the components of the fee award percentage other than the lodestar as a percentage of the total settlement amount. Thus, in assessing a multiplier, looking at the lodestar as a percentage of the settlement amount provides perspective on the other parts of the equation.

As noted above, the lodestar expressed as a percentage of the settlement amount for this case, i.e. 12.79%, is higher than in all but two of the cases on the Top 26 Chart, i.e. *Williams Companies* and *Oxford,* which settled at the summary judg-

ment stage and on the eve of trial, respectively. A significant gap exists between 12.79% and the next three highest numbers: *Freddie Mac* (8.62%), *HealthSouth* (7.99%), and *Lucent* (7.98%). Based on the fact that Plaintiffs' Counsel in this case accomplished such a good result when the settlement amount in the Action is compared to the amount of the settlement with the SEC, the court concludes that it is reasonable for the lodestar as a percentage of the settlement amount to be higher than in the cases on the Top 26 Chart other than *Williams Companies* and *Oxford.* Having reviewed the results of using various fee award percentages other than 20%, the court has determined that using a fee award percentage of 16% and assuming a multiplier of 1.56 would have the same effect as adjusting the lodestar so that the lodestar expressed as a percentage of the settlement amount would be 10.26%. This percentage would be higher than the percentage in all the cases on the Top 26 Chart except *Williams Companies* and *Oxford,* and higher than the 7.98% in *Lucent,* which is the only other case in the second group that has a percentage that is greater than one-half of 10.26%.

Using a fee award percentage of 16% would also be in the upper range of the cases in the second group, lower than only the 18% in *Cardinal Health,* where the total settlement amount was $600 million, and the 17% in *Lucent,* where the settlement amount was $517 million. Also, a fee award percentage of 16% would equate to $120 million of the $750 million settlement amount. With a lodestar of $95,942,272.25, this would equate to a multiplier of 1.25 as opposed to 1.56. The only argument against such a multiplier is that it is simply too low. However, looking at the totality of the circumstances, the court concludes that increasing the fee award percentage above 16% just so the multiplier can be larger is not merited. In any event, a fee

award percentage of 16% results in an increase over the lodestar of almost $25 million, which is not insignificant.

Although LASERS is one of the Lead Plaintiffs, it was initially not a Lead Plaintiff, and the court has not been presented with any retainer agreement in this case, unlike *Cendant* and *WorldCom*, where retainer letters provided some guidance as to the market for legal services. However, 16% is a higher percentage than was awarded in either of those cases. Notably, in *Cendant* "two leading class action firms agreed to a fee scale, for settlement during discovery, of 17.5 percent for a recovery up to $100 million; 10 percent between $100 and $300 million; 7.5 percent between $300 and $500 million; and 5 percent above $500 million." *In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*, No. 02 Civ. 5575(SWK), MDL 1500, 2006 WL 3057232, at *13 (S.D.N.Y. Oct. 25, 2006). Also, in *WorldCom*, the "retainer agreement contained a tiered percentage structure, depending upon the size of the recovery and the stage at which it was achieved...." *Id.* at *12. The structure was: 12% to 14% of any amount up to $100 million; plus 11% to 13% of any amount in the range of $100 million to $250 million; plus 9% to 12.5% of any amount in the range of $250 million to $500 million; plus 5.5% to 7.5% of any amount in the range of $500 million to $1 billion; plus 4.0% to 5.5% of any amount over $1 billion. *Id.*

■ The sixth *Goldberger* factor is public policy considerations. "[P]ublic policy supports granting attorneys['] fees that are sufficient to encourage ... counsel to bring securities class actions that supplement the efforts of the SEC." *In re Bristol–Myers Squibb Sec. Litig.*, 361 F.Supp.2d 229, 236 (S.D.N.Y.2005). Such a policy does not translate into granting a fee award in the amount requested in every case. Rather, the court must give individualized consideration to each case. If the court utilizes a fee award percentage of 16% in this case, $120 million is larger than the fee awards in all of the cases in the second group, i.e. cases where the settlement amount was $500 million to $1.2 billion, except *Royal Ahold*, where the fee award was $130,647,868.98 and the settlement amount was $1.1 billion. It would also be larger than the fee award in any case in the third group of cases, i.e. cases where the total settlements were below $500 million, and it would be $65 million greater than the fee award in *Cendant*, where the total settlement was in excess of $3.166 billion. Thus, the court concludes that a fee award percentage of 16% here is sufficient to encourage counsel to continue to represent individuals in cases such as this one.

## III. *CONCLUSION*

For the reasons set forth above, the court hereby awards Plaintiffs' Counsel attorneys' fees equal to 16% of the Settlement Fund, plus $3,314,399.90 for reimbursement of expenses.

It is so ordered.

### Appendix A

| RANK | NAME | Settlement Amount | Lodestar | Lodestar as POF |
|---|---|---|---|---|
| 1 | Enron | $7,227,390,000.00 | $127,000,000.00 | 1.76% |
| 2 | WorldCom | $6,133,000,000.00 | $ 83,183,239.00 | 1.36% |
| 3 | Tyco | $3,200,000,000.00 | $170,742,994.00 | 5.34% |
| 4 | Cendant (2000) | $3,166,000,500.00 | $ 13,038,825.00 | 0.41% |

| | | | | |
|---|---|---|---|---|
| 5 | AOL/Time Warner | $2,500,000,000.00 | $ 46,861,731.00 | 1.87% |
| 6 | Nortel I | $1,142,775,308.00 | $ 16,655,971.00 | 1.46% |
| 7 | Royal Ahold | $1,100,000,000.00 | $ 50,858,606.00 | 4.62% |
| 8 | Nortel II | $1,074,265,298.00 | $ 17,429,370.00 | 1.62% |
| 9 | McKesson | $1,042,500,000.00 | $ 38,339,176.00 | 3.68% |
| 10 | Cardinal Health | $ 600,000,000.00 | $ 18,378,123.00 | 3.06% |
| 11 | Lucent | $ 517,000,000.00 | $ 41,260,585.00 | 7.98% |
| 12 | BankAmerica | $ 490,000,000.00 | $ 28,805,991.00 | 5.88% |
| 13 | Dynegy, Inc. | $ 474,050,000.00 | $ 10,162,042.00 | 2.14% |
| 14 | Adelphia Comm. | $ 460,000,000.00 | $ 33,686,468.00 | 7.32% |
| 15 | Raytheon | $ 460,000,000.00 | $ 13,160,578.00 | 2.86% |
| 16 | Waste Management II | $ 457,000,000.00 | $ 6,842,457.00 | 1.50% |
| 17 | Global Crossing | $ 447,800,000.00 | $ 28,242,915.00 | 6.31% |
| 18 | Health South | $ 445,000,000.00 | $ 35,551,918.00 | 7.99% |
| 19 | Freddie Mac | $ 410,000,000.00 | $ 35,353,395.00 | 8.62% |
| 20 | Qwest | $ 400,000,000.00 | $ 18,547,454.00 | 4.64% |
| 21 | Cendant (2006) | $ 374,000,000.00 | $ 6,038,717.00 | 1.61% |
| 22 | Rite Aid | $ 319,580,000.00 | $ 10,237,106.00 | 3.20% |
| 23 | Williams Co. | $ 311,000,000.00 | $ 53,435,010.00 | 17.18% |
| 24 | Oxford | $ 300,000,000.00 | $ 46,910,652.00 | 15.64% |
| 24 | DaimlerChrysler | $ 300,000,000.00 | $ 15,865,520.00 | 5.29% |
| 24 | Bristol–Myers Squibb | $ 300,000,000.00 | $ 5,192,155.00 | 1.73% |
| | Xerox | $ 750,000,000.00 | $ 95,942,272.25 | 12.79% |